**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0001097
24-NOV-2015
07:59 AM**

NO. CAAP-12-0001097


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


JEE-EUN TSCHA, Plaintiff-Appellant, v.
KATHE L. THORNTON, Defendant-Appellee, and
JOHN DOES 1-10; DOE CORPORATIONS 1-10;
PARTNERSHIPS 1-10; and DOE ENTITIES 1-10, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 10-1-0175-01 KTN)

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

In a personal injury case arising out of a motor vehicle collision, Plaintiff-Appellant Jee-Eun Tscha (**Tscha**) appeals from the August 16, 2012 Judgment (**Judgment**) entered in favor of Defendant-Appellee Kathe L. Thornton (**Thornton**) by the Circuit Court of the First Circuit (**Circuit Court**).[1]

I.    BACKGROUND

On December 22, 2006, Thornton drove through the intersection of Ward Avenue and Beretania Street, against a red light, hitting Tscha's vehicle as Tscha drove along Ward Avenue with the green light. Tscha was taken to the Straub emergency room in an ambulance after the collision.

---

[1]    The Honorable Karen T. Nakasone presided.

On January 26, 2010, Tscha filed a Complaint against Thornton. The parties participated in mandatory arbitration under the Court Annexed Arbitration Program (**CAAP**).[2]

On October 18, 2010, CAAP Arbitrator Robert T. Takamatsu (**Arbitrator**) awarded Tscha $20,000 in special damages, $15,000 in general damages, and costs of $862.06. The Arbitrator also reduced the total damages by $10,000 under the "Covered Loss Deductible" (**CLD**) provision in Hawaii Revised Statues (**HRS**) § 431:10C-301.5[3] for a total award of $25,862.06.

---

[2] The Court Annexed Arbitration Program was established in 1986 pursuant to Hawaii Revised Statutes (**HRS**) § 601-20 (1993). See Murphy v. Lovin, 128 Hawai'i 145, 151, 284 P.3d 918, 924 (App. 2011). HRS § 601-20 provides, in relevant part:

> (a) There is established within the judiciary a court annexed arbitration program which shall be a mandatory and nonbinding arbitration program to provide for a procedure to obtain prompt and equitable resolution of certain civil actions in tort through arbitration. The supreme court shall adopt rules for the implementation and administration of the program by January 1, 1987.
>
> (b) All civil actions in tort, having a probable jury award value, not reduced by the issue of liability, exclusive of interest and costs, of $150,000 or less, shall be submitted to the program and be subject to determination of arbitrability and to arbitration under the rules governing the program. The rules shall include a procedure to classify and establish the order of priority according to which the actions will be processed for the determination of arbitrability and for the arbitration under the program. The court may, at its discretion, remove any action from the program.

[3] "HRS § 431:10C-301.5, enacted in 1997 (effective January 1, 1998), is part of the Hawai'i motor vehicle insurance law. See 1997 Haw. Sess. L. Act 251, § 2 at 515." State Farm Mut. Auto. Ins. Co. v. Gepaya, 103 Hawai'i 142, 146, 80 P.3d 321, 325 (2003). HRS § 431:10C-301.5 (Supp. 2014) provides:

> **§ 431:10C-301.5 Covered loss deductible.** Whenever a person effects a recovery for bodily injury, whether by suit, arbitration, or settlement, and it is determined that the person is entitled to recover damages, the judgment, settlement, or award shall be reduced by $5,000 or the amount of personal injury protection benefits incurred, whichever is greater, up to the maximum limit. The covered loss deductible shall not include benefits paid or incurred under any optional additional coverage, benefits paid under any public assistance program, or benefits paid or incurred under chapter 386.

(continued...)

On November 3, 2010, Tscha appealed from the Arbitrator's award and requested a trial *de novo* pursuant to Hawai'i Arbitration Rules (**HAR**) Rule 22.[4]

---

[3](...continued)

This court has described the CLD as follows:

> In <u>State Farm v. Gepaya</u>, the Hawai'i Supreme Court stated that HRS § 431:10C-301.5 (Supp. 1997) "was part of a full scale change to fix the motor vehicle insurance system designed to yield a significant reduction in premiums, control litigation, and provide adequate medical coverage without a cost shift to businesses and employees." <u>Gepaya</u>, 103 Hawai'i at 146, 80 P.3d at 325 (internal quotation marks, citation, and brackets omitted). The supreme court further stated that the CLD was "designed to discourage frivolous law suits and yet at the same time set a reasonable standard for litigation on legitimate claims." <u>Id.</u> at 147, 80 P.3d at 326 (quoting Conf. Comm. Rep. No. 171, in 1997 Senate Journal, at 798 (comments of Senator Baker)). The CLD works in the following manner:
>
>> 1) In cases where the damages associated with an automobile accident are less than $5,000, the claimant is precluded from suing the negligent party in an automobile accident. This is necessary in order to keep the small claims out of litigation.
>>
>> 2) In cases where the claimant has incurred medical expenses of between $5,000 and $10,000, the result of the litigation will have subtracted from the award the amount of medical expenses incurred. This precludes the claimant from receiving funds for medical expenses for which is covered [sic] under his own policy.
>>
>> . . .
>>
>> **3) In cases where the claimant has incurred medical expenses of $10,000 or more, any award obtained through any means of litigation will be reduced by $10,000.**
>
> <u>Gepaya</u>, 103 Hawai'i at 147, 80 P.3d at 326 (emphasis omitted) (quoting Conf. Comm. Rep. No. 171, in 1997 House Journal, at 999 (comments of Representative Menor)). The supreme court went on to state that the role of the statute "was to preclude a claimant from receiving a 'double recovery' for medical expenses which had been paid under the PIP coverage by reducing a recovery of damages for bodily injury[.]" <u>Gepaya</u>, 103 Hawai'i at 148, 80 P.3d at 327.

<u>Weite v. Momohara</u>, 124 Hawai'i 236, 260, 240 P.3d 899, 923 (App. 2010) (emphasis added) *cert. denied*, No. SCWC-29322, 2011 WL 716062 (Feb. 14, 2011).

[4]    HAR 22 provides, in relevant part:

**Rule 22.   REQUEST FOR TRIAL DE NOVO.**

> (A) Within twenty (20) days after the award is served
> (continued...)

In a February 15, 2012 demand letter, Tscha requested $1.25 million in general damages from Thornton to settle the claim. In a March 28, 2012 letter, Tscha repeated the $1.25 million offer as a binding arbitration offer under HRS § 431:10C-213.5.[5] On April 12, 2012, Thornton's counsel notified the Circuit Court that Thornton had declined Tscha's binding arbitration offer.

A jury trial to determine the amount of damages caused by Thornton's negligence commenced on June 11, 2012. Tscha testified that her head and the left side of her body were hit during the collision, and that after the collision, she could not move her neck and her head and chest "hurt like hell[.]"

The treating physician in the Straub emergency room, Dr. Earl Kubota, testified that Tscha "had been in a motor vehicle accident and complained of pain in the left hip, thigh, neck, and low back as well as head." Dr. Kubota noted that there was some tenderness on the left side of Tscha's head, her left shoulder area, and her left thigh, and she complained of a

---

[4](...continued)
upon the parties, any party may file with the clerk of the court and serve on the other parties and the Arbitration Administrator a written Notice of Appeal and Request for Trial De Novo of the action.

[5]    HRS § 431:10C-213.5 (2005) provides, in relevant part:

**431:10C-213.5 Binding arbitration.** (a) A claimant or defendant shall have the option to elect arbitration to resolve a claim in tort that is covered by motor vehicle liability insurance.

(b) A claimant or defendant may submit any dispute relating to a tort claim to binding arbitration by either filing a written request with the clerk of the circuit court in the circuit where the accident occurred or by agreement.
(c) A claimant or defendant shall have the opportunity to decline arbitration.

. . . .

(e) Fees and costs of arbitration shall be borne equally by the parties, unless otherwise agreed to by the parties.
(f) Collection of any arbitration award issued under this section shall be limited to the applicable liability policy limit, unless the insured tortfeasor otherwise agrees.

headache.  She exhibited no decreased range of motion in her neck or back, vertebral point tenderness, muscle spasm, or fracture or dislocation.  Dr. Kubota discharged Tscha that same day in "stable condition" with no limitations and recommended "local ice to the painful areas and Tylenol, acetaminophen, for pain."  He also referred Tscha to Dr. Ira D. Zunin (**Dr. Zunin**) for a follow-up examination.

On January 5, 2007, Tscha sought treatment from Dr. Zunin, who listed Tscha's chief complaints as daily recurrent headaches, neck pain, shoulder pain, upper extremity radiation, low back pain, and left hip pain with radiation to the left lower extremity.  Dr. Zunin offered Tscha "a brief course of manual therapy and physical therapy" and prescribed naproxen 500 mg.

Tscha testified that for the first six months after the 2006 accident, she suffered from daily migraines, that following those initial six months, she experienced between one and five migraines per week, and that at the time of trial, she continued to experience pain and her activity was limited.

Evidence presented at trial showed that between January 2007 and January 2010, Tscha sought treatment, including physical therapy, manual therapy, massage therapy, acupuncture, and herbs and/or nutritional supplements from various healthcare providers. Tscha testified that because she was concerned about potential side effects from certain medicines, she did not take them, and that she had recently stopped taking even Extra Strength Tylenol. She believed that the treatments she had pursued, such as massage, acupuncture, and stretching, helped to relieve her pain. At trial, Tscha introduced Plaintiff's Exhibit 23, a "Summary of Medical Expenses", listing fourteen different providers and total medical expenses of $41,945.77.

Tscha testified that she had previously been in a "minor car accident", in 1986, when she was twenty or twenty-one years old.  She began to experience migraines "that year or the year after," and between the previous accident and the December 22, 2006 incident, she experienced approximately four or five migraines, for which she did not seek treatment.

Thornton's expert witness, Dr. Anthony J. Mauro (**Dr. Mauro**), testified that he would apportion 100 percent of Tscha's "currently described pains in the neck, low back, hip, and right shoulder" to the 2006 collision and that he would apportion 20 percent of Tscha's migraine headaches to any pre-existing condition and 80 percent to the exacerbation of her symptoms from the 2006 collision. In his June 7, 2011 independent medical examination report, he also stated the following:

> The type, intensity, frequency, and duration of treatments provided fall outside acceptable medical standards as appropriate for the conditions diagnosed. Evidence based application of massage and physical therapy limits such treatments to a few weeks to a few months following an acute injury. Prolonged massage and/or physical therapy treatments have not been demonstrated useful for improving long-term discomfort or functional capacity. . . . Prolonged therapies that have little or no chance of improving chronic discomfort and improving functional capacity are not cost effective, and may lead to passive dependance [sic], and may supplant more appropriate self-directed therapies including restitution of activities of daily living, and self-directed rehabilitative exercises, which help to avoid deconditioning and re-aggravation of soft tissue sprain and strain.
>
> . . .
>
> There are no significant findings on imaging studies that can relate to the subject motor vehicle accident. The findings on the MRI of the brain are nonspecific. While it is true that the "foci of gliosis" and the hemispheres can be seen in instances of migraine headache, there is no conclusion regarding the clinical significance of these "spots." There is no clinical evidence that such spots are associated with any clinical effect. There is no specific management of the "spots" in reference to migraine headaches. Imaging of the cervical and lumbar spine is limited to minimal degenerative changes, preexisting, with no evidence of traumatic neck or low back injury.
>
> . . .
>
> Prognosis is guarded. It is now four-and-a-half years from the injury. The patient has chronic symptoms, reports that she cannot work on her neck by herself, cannot engage in exercise because it aggravate[s] symptoms, has stopped working because she finds mental effort frustrating, and appears, basically, interested in pursuing endless passive modality therapies with the unrealistic expectation that she will "gradually improve."
>
> Impairment sustained by the patient as a result of the accident on December 22, 2006 are limited to subjective limitations based on reports that activities increase subjective symptoms. There is no documentation of an organic structural lesion that would be aggravated by sitting, standing, returning to work duties, or performance of reasonable rehabilitative exercises. The patient's inability to engage in such activities is based on her

subjective report of increased symptomatology. She has eschewed prescription of medications that might improve chronic migraines.

. . .

There is no objective medical basis on which to declare the patient disabled from reasonable work activities.

. . .

I do not find evidence of a concurrent medical nor psychological condition affecting Ms. Tscha's recovery other than her subjective assessment that she cannot return to activities because she experiences discomfort, and a likely role of secondary gain motivation.

Tscha's expert witness, Dr. Huidy Shu (**Dr. Shu**), testified that he believed Tscha suffered from chronic pain and "classic migraine with aura." He also opined that the migraines were "triggered by the [December 22, 2006] auto accident." He testified that MRI scans of Tscha's brain "showed multiple white matter lesions" that "are basically abnormalities within the deeper parts of the brain" that are much more likely to be found in patients with migraine with aura. Based on Tscha's concerns about prescription medications, Dr. Shu prescribed a commonly used preventative medicine for migraines with a "very, very low likelihood of developing side effects." However, he also testified that "[t]here is some research that backs up the use of certain alternative therapies for migraines" and that Tscha's desire to pursue alternative care was "perfectly reasonable."

Thornton's counsel elicited testimony from both Dr. Mauro and Dr. Shu that migraines are more common in women than in men. During redirect examination, Shu testified that the fact that migraines are more common in women than in men did not "exclude trauma as a cause of migraine in a woman[.]" He also testified that despite Tscha's previous history of migraines, Tscha's lack of migraines in the six years preceding the December 22, 2006 accident was "more consistent with a latent condition."

Tscha requested an award of $465,500. In contrast, Thornton argued that Tscha's special damages should be limited to the cost of the ambulance service ($542.40) and the Straub emergency room care ($1,680.36), which totaled $2,230.76, and

that $2,000 for general damages "would not be unreasonable." Thornton also stated that if the jury wanted "to award the outer limits of what could be considered reasonable, according to Dr. Mauro, that would constitute two to three months of treatment[,]" which would include "[t]he ambulance, the Straub ER, 18 visits to Dr. Zunin, and one visit to A & C Wellness and Healing." The total cost of these treatments was "roughly $4,303.57."

On June 15, 2012, the parties agreed upon jury instructions. On June 18, 2012, before closing statements were to be given, the Circuit Court informed the parties that it would be revising the jury instructions to include a portion of Hawai'i Standard Civil Jury Instructions (**HAWJIC**) No. 7.1 because it "felt it was necessary to have a brief definition of legal cause." The proposed instruction was the first sentence of HAWJIC No. 7.1: "An act or omission is a legal cause of an injury if it was a substantial factor in bringing about the injury." The proposed instruction omitted the second clause of HAWJIC No. 7.1,[6] which states:

> One or more substantial factors such as the conduct of more than one person may operate separately or together to cause an injury or damage. In such a case, each may be a legal cause of the injury/damage.

Tscha objected to this proposed instruction (**Instruction No. 7.1**) as being incomplete and potentially misleading to the jury. The Circuit Court stated that it would give the proposed Instruction No. 7.1 over Tscha's objection.

On June 18, 2012, the jury returned a verdict in favor of Tscha, awarding special damages of $2,200 and general damages of $4,300.

---

[6]     Hawai'i Standard Civil Jury Instructions No. 7.1 (1999), available at http://www.courts.state.hi.us/docs/legal_references/jury_instructions_civil.pdf

On June 21, 2012, Thornton moved to apply a $10,000 CLD[7] to the verdict amount and for $15,000 in attorneys' fees and $13,648.80 in costs as CAAP sanctions under HAR 25[8] and HAR 26.[9]

---

[7] Tscha did not dispute, either before the Circuit Court or on appeal, that the CLD of $10,000 was applicable to this case under HRS § 431:10C-301.5.

[8] HAR 25 provides:

**Rule 25. THE PREVAILING PARTY IN THE TRIAL DE NOVO; COSTS.**

(A) The "Prevailing Party" in a trial de novo is the party who (1) appealed and improved upon the arbitration award by 30% or more, or (2) did not appeal and the appealing party failed to improve upon the arbitration award by 30% or more. For the purpose of this rule, "improve" or "improved" means to increase the award for a plaintiff or to decrease the award for the defendant.

(B) The "Prevailing Party" under these rules, as defined above, is deemed the prevailing party under any statute or rule of court. As such, the prevailing party is entitled to costs of trial and all other remedies as provided by law, unless the Court otherwise directs.

[9] HAR 26 provides:

**Rule 26. SANCTIONS FOR FAILING TO PREVAIL IN THE TRIAL DE NOVO.**

(A) After the verdict is received and filed, or the court's decision rendered in a trial de novo, the trial court may, in its discretion, impose sanctions, as set forth below, against the non-prevailing party whose appeal resulted in the trial de novo.

(B) The sanctions available to the court are as follows:
(1) Reasonable costs and fees (other than attorneys' fees) actually incurred by the party but not otherwise taxable under the law, including, but not limited to, expert witness fees, travel costs, and deposition costs;
(2) Costs of jurors;
(3) Attorneys' fees not to exceed $15,000;

(C) Sanctions imposed against a plaintiff will be deducted from any judgment rendered at trial. If the plaintiff does not receive a judgment in his or her favor or the judgment is insufficient to pay the sanctions, the plaintiff will pay the amount of the deficiency. Sanctions imposed against a defendant will be added to any judgment rendered at trial.

(D) In determining sanctions, if any, the court shall consider all the facts and circumstances of the case and the intent and purpose of the Program in the State of Hawai'i.

On July 30, 2012, the Circuit Court filed the "Order Granting in Part Defendant Kathe L. Thornton's Motion for Application of Covered Loss Deductible, and for Attorney's Fees and Costs, Filed 6/21/12," ordering that the $10,000 CLD would be applied to the $6,500 jury verdict and that Thornton would be awarded $10,000 in attorneys' fees as CAAP sanctions. On August 16, 2012, the Circuit Court entered the Judgment in favor of Thornton.

On August 24, 2012, Tscha filed a post-judgment Motion for New Trial pursuant to Hawai'i Rules of Civil Procedure (**HRCP**) Rule 59, arguing that Instruction No. 7.1 was improper and the jury's verdict was inconsistent and against the manifest weight of the evidence. On October 2, 2012, Thornton filed a memorandum in opposition to the Motion for New Trial.

On October 10, 2012, the Circuit Court continued a hearing on the Motion for New Trial to obtain trial transcripts and asked the parties to file supplemental memoranda within two weeks after the trial transcripts became available.

On November 7, 2012, Tscha notified the Circuit Court that the transcripts had been received and requested a briefing schedule. On November 26, 2012, Tscha was notified that the requested supplemental memoranda were due by December 14, 2012.

On November 22, 2012, Tscha's Motion for New Trial was denied by operation of law pursuant to Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 4(a)(3) because ninety days had lapsed from the date of filing without the Circuit Court acting on the motion.

On December 14, 2012, the parties filed the requested supplemental memoranda.

During a December 18, 2012 telephonic status conference, the parties discussed Tscha's ex parte motion[10] under HRAP 4(a)(4)(B) to request a 90-day extension of time to file her Notice of Appeal to allow the Circuit Court time to consider the

---

[10] The motion was dated December 17, 2012 but was not filed until December 19, 2012.

supplemental memoranda the parties had submitted on December 14, 2012.    Tscha's memorandum in support of the motion had noted that Tscha's Motion for New Trial would be considered automatically denied as of November 22, 2012 under HRAP 4(a)(3) unless the Circuit Court granted the motion for extension of time.

The Circuit Court set the hearing for Tscha's motion for extension of time for December 21, 2012.    The Circuit Court also indicated that it intended to issue a ruling on the underlying Motion for New Trial by the end of December 19, 2012.

On December 20, 2012, the Circuit Court entered a minute order denying Tscha's Motion for New Trial, concluding that the jury instruction on legal cause, as given, was necessary and not incomplete, prejudicial, or misleading, and that the verdict did not evidence any failure by the jury to follow applicable law.

Tscha timely filed a Notice of Appeal on December 21, 2012.

II.  POINTS OF ERROR ON APPEAL

Tscha raises three points of error on appeal:

(1)   The Circuit Court erred in giving an incomplete instruction on legal cause and the error was prejudicial to Tscha;

(2)   The Circuit Court abused its discretion in denying Tscha's Motion for New Trial; and

(3)   The Circuit Court abused its discretion in imposing CAAP sanctions in addition to applying the CLD.

III. APPLICABLE STANDARDS OF REVIEW

> When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.  Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Kobashigawa v. Silva, 129 Hawai'i 313, 320, 300 P.3d 579, 586 (2013) (quoting Nelson v. Univ. of Haw., 97 Hawai'i 376, 386, 38 P.3d 95, 105 (2001)).

> Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence.
>
> A . . . court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.
>
> In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion.

Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawai'i 286, 296-97, 141 P.3d 459, 469-70 (2006) (internal citations and quotation marks omitted, format altered).

"Under the plain language of HAR 26, it is within the discretion of the court whether to award sanctions and if so, for what amount." Weite v. Momohara, 124 Hawai'i 236, 251, 240 P.3d 899, 914 (App. 2010) (citing Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai'i 494, 511, 880 P.2d 169, 186 (1994)).

IV. DISCUSSION

    A.    Jury Instruction No. 7.1

        Tscha argues that the Circuit Court erred in giving Instruction No. 7.1 because the instruction omitted the second clause of HAWJIC No. 7.1. The Circuit Court gave Instruction No. 7.1 as follows: "An act or omission is a legal cause of an injury if it was a substantial factor in bringing about the injury." Tscha contends that by omitting the second clause of HAWJIC No. 7.1, the Circuit Court failed "to explain that there could be more than one substantial cause" of Tscha's migraines, and that based on the evidence presented at trial and Thornton's closing arguments,

> [t]he jury could have mistakenly concluded from the evidence that, although the car accident caused or aggravated Ms. Tscha's migraine condition, because there were other contributing causes such as the prior accident, family

history, age[,] and gender[,] it was not the substantial factor under the legal cause instruction given.

We disagree.  First, "appellate courts are not bound by pattern jury instructions." Dolan v. Hilo Med. Center, 127 Hawai'i 325, 342, 278 P.3d 382, 399 (App. 2012) (citing State v. Mark, 123 Hawai'i 205, 219, 231 P.3d 478, 492 (2010)); see also State v. Sawyer, 88 Hawai'i 325, 335, 966 P.2d 637, 647 (1998) (rejecting defendant's argument "that deviation from the HAWJIC is prejudicial per se" and holding that "[a] failure . . . to strictly conform to HAWJIC [instructions] does not automatically result in incomplete and confusing jury instructions.").

Second, the language the Circuit Court omitted from HAWJIC No. 7.1 arguably would have been superfluous, confusing, or misleading in that it implies that there was more than one tortfeasor or act of negligence, and does not implicate pre-existing conditions:

> One or more substantial factors **such as the conduct of more than one person** may operate separately or together to cause an injury or damage.  In such a case, each may be a legal cause of the injury/damage.

(Emphasis added).

Third, and more importantly, the Circuit Court also gave a separate Instruction No. 7.3 on "Pre-Existing Injury or Condition," which stated:

> In determining the amount of damages, if any, to be awarded to plaintiff, you must determine whether plaintiff had an injury or condition which existed prior to the December 22, 2006 incident.  If so, you must determine whether plaintiff was fully recovered from the pre-existing injury or condition or whether the pre-existing injury or condition was latent at the time of the subject incident.  A pre-existing injury or condition is latent if it was not causing pain, suffering or disability at the time of the subject incident.
>
> If you find that plaintiff was fully recovered from the pre-existing injury or condition or that such injury or condition was latent at the time of the subject incident, then you should not apportion any damages to the pre-existing injury or condition.
>
> If you find that plaintiff was not fully recovered and that the pre-existing injury or condition was not latent at the time of the subject incident, you should make an apportionment of damages by determining what portion of the damages is attributable to the pre-existing injury or condition and limit your award to the damages attributable to the injury caused by defendant.

> If you are unable to determine, by a preponderance of the evidence, what portion of the damages can be attributed to the pre-existing injury or condition, you may make a rough apportionment.
>
> If you are unable to make a rough apportionment, then you must divide the damages equally between the pre-existing injury or condition and the injury caused by defendant.

Instruction No. 7.3 clearly conveyed that it was the jury's prerogative to decide whether Tscha had any pre-existing injuries or conditions, and if so, whether those injuries or conditions were latent or not latent. The jury was specifically instructed that it was free to determine **"what portion** of the damages can be attributed to the pre-existing injury or condition[.]" (Emphasis added.) The instruction thus gave the jury the option to find that Tscha's pre-existing injury or condition was not latent but that some of the damages could also be apportioned to Thornton's conduct, and made it clear that it was possible that both a pre-existing injury or condition and Thornton's conduct could be legal causes of Tscha's injuries and were not mutually exclusive causes.

Tscha nonetheless argues that Instruction No. 7.3

> [did] not cure the defect in failing to provide a complete instruction on legal cause, because the jury might never reach apportionment if it mistakenly applies the causation analysis. . . . Thus, if the jury erroneously concluded that some other factor (for example, the 1986 accident) was the most substantial factor in causing Ms. Tscha's migraines, and therefore erroneously concluded that the accident caused by Ms. Thornton was not a legal cause of Ms. Tscha's migraine[s], it would never have the opportunity to make an apportionment of damages. The only damages which are subject to apportionment are the ones found to have been legally caused by defendant.

However, nowhere in the jury instructions was the jury instructed that it must find that Thornton's conduct was "the substantial factor" or "the most substantial factor" in order to determine that Thornton's conduct was a legal cause of Tscha's injuries. Indeed, the language of Instruction No. 7.1 reads: "An act or omission is <u>a</u> legal cause of an injury if it was <u>a</u> substantial factor in bringing about the injury." (Emphasis added.)

While the Circuit Court's decision not to give the second clause of HAWJIC No. 7.1 meant that Instruction No. 7.1 did not explicitly state that "[o]ne or more substantial factors such as the conduct of more than one person may operate separately or together to cause an injury or damage[,]" the language of Instruction No. 7.3 made it clear to the jury that more than one factor, including a pre-existing condition, could have contributed to Tscha's injuries. "Jury instructions . . . must be considered as a whole. Moreover, a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given." Montalvo v. Lapez, 77 Hawai'i 282, 286, 884 P.2d 345, 349 (1994) (internal quotation marks omitted) (quoting State v. Pioneer Mill Co., Ltd., 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981)). In light of Instruction No. 7.3, Tscha's argument that, without receiving the second clause of HAWJIC No. 7.1, the jury may have erroneously concluded that Thornton's conduct could not be a "substantial factor" in bringing about Tscha's injuries if other factors also contributed to Tscha's injuries is of no avail.

We cannot conclude that Instruction No. 7.1, when considered in the context of all of the other instructions, was "prejudicially insufficient, erroneous, inconsistent, or misleading." Kobashigawa, 129 Hawai'i at 320, 300 P.3d at 586. Thus, we conclude that the Circuit Court did not err in giving Instruction No. 7.1.

B.    Motion for New Trial

Tscha argues that the Circuit Court abused its discretion in denying her Motion for New Trial because Instruction No. 7.1 was improper. As we conclude that Instruction No. 7.1 as given was not erroneous, we need not further address this contention.

Tscha also contends that the Circuit Court erred in denying her Motion for New Trial because "the shockingly small verdict" is against the manifest weight of the evidence presented at trial.

. Inasmuch as the questions presented involve the scope of special compensatory damages, the underlying principles relating to damages in the personal injury context are pertinent. Compensatory damages seek to "compensate the injured party for the injury sustained," Kuhnert v. Allison, 76 Hawai'i 39, 44, 868 P.2d 457, 462 (1994), in hopes of "restor[ing] a plaintiff to his or her position prior to the tortious act[,]" Zanakis-Pico v. Cutter Dodge, Inc., 98 Hawai'i 309, 327, 47 P.3d 1222, 1240 (2002) (Acoba, J., concurring). The law divides such "damages into two broad categories-general and special." Ellis v. Crockett, 51 Haw. 45, 50, 451 P.2d 814, 819 (1969). General damages "encompass all the damages which naturally and necessarily result from a legal wrong done[,]" id., and include such items as "pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." Dunbar v. Thompson, 79 Hawai'i 306, 315, 901 P.2d 1285, 1294 (App. 1995) (citation omitted). Special damages are "the natural but not the necessary result of an alleged wrong[,]" Ellis, 51 Haw. at 50, 451 P.2d at 819, and are "often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity." Dunbar, 79 Hawai'i at 315, 901 P.2d at 1294.

Bynum v. Magno, 106 Hawai'i 81, 85-86, 101 P.3d 1149, 1153-54 (2004).

Tscha argues that the jury's $2,200 special damages award was deficient:

> In this case, when the $2,000.00 [sic] special damage verdict is compared to the evidence, it is clear that amount is not within the range of substantial evidence. While certain injuries and damages were contested, the $2,000.00 [sic] awarded for special damages does not even begin to approach to plaintiff's proven expenses for items which are not in dispute. Defendant admitted to liability for expenses related to the emergency room visit, which totalled $2,230.76. There was no dispute that 100% of Ms. Tscha's soft tissue injuries were attributable to the accident; the total cost of medical visits relating to those complaints is $14,743.51. The total cost for imaging studies was: $8,081.00. . . . the cost of physical therapy and massage undertaken within a few weeks or months of the accident was $4,303.57. . . . it is clear that Ms. Tscha's undisputed special damages were at least $14,615.33. There is no view of the evidence in this case that would render the $2,000.00 [sic] special damage award consistent with the special damages proven at trial[.]

She cites to Striker v. Nakamura for the proposition that where

> the verdict of the jury was grossly inadequate[,] . . . demonstrates failure to consider essential elements of damage or damages in amount[s] conceded to have been suffered . . . [, and] demonstrates failure to abide by the instructions of the court and an improper compromise between

> liability and compensation[, . . . ] there was error of law
> in overruling the motion for a new trial[.]

Striker v. Nakamura, 50 Haw. 590, 593, 446 P.2d 35, 37 (1968).

In Striker, the "plaintiff proved that she incurred medical expenses totalling $540.91 and suffered damage to her automobile in the sum of $107.73. It was not disputed that plaintiff incurred expenses and suffered damages totalling $648.64." Striker, 50 Haw. at 593, 446 P.2d at 37. The defendant "conceded to the reasonableness of medical expenses totalling $540.91 and bills, checks, etc., were introduced into evidence without any objection." Id. at 591, 446 P.2d at 36. Thus, the jury's verdict of $307.73 was "grossly inadequate" and it was error for the trial court to deny plaintiff's motion for new trial on the issue of damages. Id. at 593, 446 P.2d at 38.

The instant case is distinguishable from Striker in that, while Thornton did not dispute the stated value of Tscha's medical expenses, she did dispute whether they were reasonable and whether Thornton should be held liable for all of them. During closing argument, Thornton argued that Tscha's special damages should be limited to the cost of the ambulance service ($542.40) and the Straub emergency room care ($1,680.36), and that $2,000 for general damages "would not be unreasonable." Thornton also argued that if the jury wanted "to award the outer limits of what could be considered reasonable, according to Dr. Mauro, that would constitute two to three months of treatment[,]" which would include "[t]he ambulance, the Straub ER, 18 visits to Dr. Zunin, and one visit to A & C Wellness and Healing." The total cost of these treatments was "roughly $4,303.57." Thus, Tscha's special damages were not undisputed as Tscha claims.

It was Tscha's burden to prove both that she suffered injuries as a result of the collision and the extent and value of her damages related to those injuries. See Kaopuiki v. Kealoha, 104 Hawai'i 241, 249, 87 P.3d 910, 918 (App. 2003). The issue of causation was in dispute as to some of the medical expenses, and both parties introduced evidence to support their conflicting positions. It appears the jury decided that Tscha failed to show

that her migraines were legally caused by the collision and accordingly did not award any special damages for the treatment she sought for her migraines. Tscha's argument - that the Circuit Court abused its discretion in failing to grant her Motion for New Trial because the jury's award was inadequate - "fails to acknowledge evidence supporting the jury's verdict in this case." Id. at 251, 87 P.3d at 920. For example, Dr. Mauro stated in his independent medical examination report and trial testimony that the amount and type of treatments Tscha had received was not reasonable or appropriate and that there was no medical or physiological basis for the limitation of Tscha's activity.

Tscha also argues that the jury's $4,300 general damages award was "clearly insufficient" because "no reasonable juror could conclude that the $4,000 [sic] award reflected adequate compensation for Ms. Tscha's pain and suffering." It is a "well-settled principle in this jurisdiction that 'the proper amount of damages [to be awarded] . . . is within the exclusive province of the jury, since jurors are the sole judges of all disputed questions of fact.'" Kato v. Funari, 118 Hawai'i 375, 381, 191 P.3d 1052, 1058 (2008) (citing Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 385, 742 P.2d 377, 383 (1987)). "It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion." Stanford Carr, 111 Hawai'i at 296-97, 141 P.3d at 469-70 (citation omitted). Reviewing the entirety of the record, it appears that substantial evidence supported the jury's general damages award in this case; therefore, we conclude that the Circuit Court did not abuse its discretion in denying Tscha's Motion for New Trial.

C.    CAAP Sanctions and the Covered Loss Deductible

Tscha argues that by both applying the CLD and awarding CAAP sanctions to Thornton, the Circuit Court unconstitutionally impeded Tscha's right to a civil jury trial under article 1, § 13

of the Hawai'i Constitution.[11] Tscha does not challenge, however, the Circuit Court's authority to impose CAAP sanctions or the applicability of the $10,000 CLD to this case; nor does she allege that the amount of the CAAP sanctions actually imposed was inherently excessive. Instead, she argues that because she was, in effect, subjected to a negative judgment, and then sanctioned under the CAAP rules, the court's ruling unconstitutionally burdened her right to a jury trial.

In the seminal case regarding CAAP sanctions, the supreme court explained the purpose behind HAR 26 as follows:

> [Hawai'i's] legislature statutorily codified the CAAP as a means to reduce the delay and costs involved in protracted litigation by "provid[ing] for a procedure to obtain prompt and equitable resolution of certain civil actions in tort through arbitration." HRS § 601-20(a) (Supp. 1992); HAR 2(A); Spec. Comm. Rep. No. S5-86, in 1986 Senate Journal Special Session, at 29. At the same time, the supreme court was delegated the authority to adopt rules to implement the CAAP. HRS § 601-20(a). In doing so, this court promulgated HAR 26 to enforce the objectives of the CAAP
>
> . . .
>
> **Thus, HAR 26 sanctions may be imposed to penalize a non-prevailing party whose decision to appeal the arbitration award and pursue a trial *de novo* was unreasonable under the circumstances of the particular case, albeit grounded to some degree in law or fact.**
>
> Accordingly, based on the plain language of the rule, we hold that, when the circuit court's decision to impose HAR 26 sanctions is challenged on appeal, the only relevant inquiries are: (1) whether the party against whom the sanctions were imposed is a "non-prevailing party" in the trial *de novo*; and (2) whether the decision to impose sanctions constituted an abuse of discretion.

Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai'i 494, 510-11, 880 P.2d 169, 185-86 (1994) (emphasis added, footnote omitted).

---

[11] Article I, § 13 of the Constitution of the State of Hawai'i provides:

> In suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved. The legislature may provide for a verdict by not less than three-fourths of the members of the jury.

Haw. Const. art. I, § 13.

In Richardson, the plaintiffs challenged the constitutionality of the $5,000 CAAP sanction, arguing that the imposition of the sanction violated their right to a civil jury trial under article I, § 13 of the Hawai'i Constitution. The supreme court noted that the right to a civil jury trial in article I, § 13 of the Hawai'i Constitution could be subject to "reasonable conditions on its exercise." Id. at 513, 880 P.2d at 188. The supreme court held that "if HAR 26 serves a legitimate purpose and does not impermissibly burden the [plaintiff's] civil jury trial right, there is no violation of due process or article I, § 13." Id. at 514, 880 P.2d at 189. It reasoned:

> First, HAR 26 sanctions are available only if the appealing party does not improve its position, at the present time, by 15% or more, and even then, sanctions are *discretionary*. Accordingly, every party has the ability to avoid HAR 26 sanctions by undertaking a frank post-arbitration evaluation of the merits of their case.
>
> Second, the potential magnitude of the sanction is not *per se* unreasonable. Sanctions are presently limited to $5,000.00 in attorneys' fees plus actual "costs" as that term is defined. Many courts have upheld similar or greater potential sanctions as reasonable.

Id. at 514-15, 880 P.2d at 189-90 (footnote omitted). However, the supreme court clarified that

> although the amount of sanctions authorized by HAR 26 is not *per se* unconstitutional, "the problem is one of degree rather than kind." Christie-Lambert, 39 Wash.App. at 307, 693 P.2d at 167. For example, as the Pennsylvania Supreme Court has noted with regard to a court rule requiring the payment of arbitrators' fees as a condition to post-arbitration jury trial:
>
>> [T]he necessity of paying [$75 in arbitrators' fees] as the condition for the right to appeal [from a mandatory arbitration award] would seemingly operate as a strong deterrent, amounting practically to a denial of that right, if the case should involve only . . . as little as $250.
>
> Application of Smith, 381 Pa. at 232, 112 A.2d at 630. Thus, the amount of sanctions imposed in a given case must not be so disproportionate to the amount in controversy so as to operate as a practical denial of the right to a jury trial in civil cases.

Id. at 515, 880 P.2d at 190.

Applying this standard to the plaintiffs' claims in Richardson, the supreme court compared the approximate amount in controversy (between $60,441.80, the arbitration award, and

$150,000, the amount demanded by the plaintiffs in their settlement conference statement) with the $5,234.41 sanction the trial court imposed and held that "[a]lthough no fixed lines can be drawn, we do not believe the $5,234.41 sanction was unreasonable." Id. (citation and footnote omitted). Thus, the court held that

> [w]hen considering the important interests that HAR 26 serves and the limits placed on its use, we cannot say that HAR 26 imposed an unreasonable burden on the [plaintiffs'] right to a civil jury trial. Therefore, we conclude that the sanctions awarded in this case did not violate due process or article I, § 13.

Id.

Tscha argues that, in this case, the justification for imposing a sanction on her is less compelling than it was in Richardson because CAAP Rule 28 now provides a better, alternative method for ensuring meaningful participation in the CAAP program. Thus, she submits, "[t]he present-day CAAP sanction scheme as imposed on motor vehicle accident victims such as Ms. Tscha is unconstitutional under the Richardson court's reasoning." Specifically, Tscha argues that: (1) the maximum attorneys' fee sanction allowed under HAR 26 has increased from $5,000 to $15,000 since Richardson was decided; (2) the chance that an injured plaintiff will be compelled to pay a sanction has been substantially increased because HAR 25 has been amended so that a plaintiff who seeks a trial de novo must improve upon their arbitration award by at least 30 percent in order to be a "prevailing party" compared to 15 percent under the version of the rule that was in effect when Richardson was decided; (3) "the rules now make clear that the CAAP definition of prevailing party applies to the award of costs under the Rules of Civil Procedure, so an injured party who would otherwise be considered 'prevailing' under the Civil Rules will not be reimbursed for their costs and can be made to pay the losing defendant's taxable costs"; and (4) the Richardson court did not take into account

that the CLD will apply under HRS § 431:10C-301.5[12] to depress the size of an award and "reduce the amount in controversy to a level that makes the risk of the sanction to [sic] great to bear."

Tscha cites no precedent or legislative history to support her arguments that following the enactment of HAR 28,[13] HAR 26 sanctions are no longer needed. Furthermore, HAR 28 plainly states that sanctions imposed under HAR 28 "are independent of the sanctions under Rule 26."

Tscha gives short shrift to the purpose of HAR 26 sanctions, which is "to penalize a non-prevailing party whose decision to appeal the arbitration award and pursue a trial *de novo* was unreasonable under the circumstances of the particular case[.]" Moniz v. Freitas, 79 Hawai'i 495, 499, 904 P.2d 509, 513 (1995) (citation and internal quotation marks omitted). In the instant case, the Arbitrator awarded Tscha $20,000 in special damages, $15,000 in general damages, and costs of $862.06, but also reduced the total damages by the $10,000 CLD for a net award of $25,862.06. Tscha rejected the Arbitrator's award, made a settlement demand of $1.25 million, and then sought $465,500 in damages in a trial *de novo*. The jury awarded $6,500 in damages,

---

[12]     We note that HRS § 431:10C-301.5, which established the CLD, was enacted in 1997 and effective January 1, 1998, after Richardson was decided in 1994. See State Farm Mut. Auto. Ins. Co. v. Gepaya, 103 Hawai'i 142, 146, 80 P.3d 321, 325 (2003).

[13]     HAR 28 provides:

> **Rule 28.  SANCTIONS FOR FAILURE TO MEANINGFULLY PARTICIPATE IN ARBITRATION HEARING.**
>
> The Arbitration Judge, on the motion of any party filed and served within thirty (30) days after the arbitration award is served upon the parties by the Arbitration Administrator, shall have the power to award sanctions against any party or attorney for failure to participate in the arbitration hearing in a meaningful manner.  Sanctions may include costs, expert fees and attorneys' fees reasonably incurred by all other parties for the arbitration hearing and in the prosecution of the motion for sanctions.  These sanctions are independent of sanctions under Rule 26.  The court may hold hearings as deemed appropriate.  If the court determines that the motion was brought without good cause, it may award costs and attorney fees against the movant.

and the Circuit Court reduced that award by the $10,000 CLD for a net award of $0.

In light of the above, and given that the amount in controversy was arguably between $25,862.06 (the net arbitration award) and the $465,000 Tscha sought at trial, (or arguably the $1.25 million she demanded to settle the claim before trial), we cannot conclude that the $10,000 in CAAP sanctions the Circuit Court imposed under HAR 26 was "so disproportionate to the amount in controversy so as to operate as a practical denial of the right to a jury trial in civil cases." Richardson, 76 Hawai'i at 515, 880 P.2d at 190. Thus, the sanctions did not violate Tscha's right to a jury trial under article I, § 13 of the Hawai'i Constitution, and the Circuit Court did not abuse its discretion in awarding the sanctions, notwithstanding the application of the CLD.

V.    CONCLUSION

For these reasons, the Circuit Court's August 16, 2012 Judgment is affirmed.

DATED: Honolulu, Hawai'i, November 24, 2015.

On the briefs:

Janice P. Kim
for Plaintiff-Appellant

Thomas Tsuchiyama
for Defendant-Appellee

Presiding Judge

Associate Judge

Associate Judge